# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| FIRST HARTFORD REALTY CORPORATION, | ) ) ) | |
| Plaintiff / Counterclaim-Defendant, | ) ) | |
| v. | ) ) | C.A. No. N23C-06-085 PRW |
| FOOD VENTURES NORTH AMERICA, INC., d/b/a WILD FORK FOODS, | ) ) ) ) | |
| Defendant / Counterclaim-Plaintiff. | ) | |

Submitted: August 25, 2025
Decided: November 25, 2025

## DECISION AFTER TRIAL

G. Kevin Fasic, Esquire, Charles A. McCauley III, Esquire, and Bradley T. Meyer, Esquire, OFFIT KURMAN, P.A., Wilmington, Delaware, *Attorneys for Plaintiff/Counterclaim-Defendant First Hartford Realty Corporation.*

R. Montgomery Donaldson, Esquire, Richard G. Placey, Esquire, and Stephania A. Rosca, Esquire, MONTGOMERY, MCCRACKEN, WALKER & RHOADS LLP, Wilmington, Delaware; John P. Storti, Esquire, and Shane O'Connor, Esquire, BERG, HILL, GREENLEAF, RUSCITTI, LLP, Boulder, Colorado, *Attorneys for Defendant/Counterclaim-Plaintiff Food Ventures North America Inc., d/b/a Wild Fork Foods.*

**WALLACE, J.**

Among other things, this case is about a transformer, decorative lighting, a sidewalk, and a brick monument sign welcoming visitors to Horsham, Pennsylvania. These are the sort of finishing touches that a store's passersby would hardly notice. But here, those small elements set off a much larger conflict. A disagreement over who should pay for some lighting or a welcome sign gradually expanded into a dispute between two seasoned commercial entities. In fact, what began on one parcel in Horsham ultimately infected projects more than a thousand miles away, with each side claiming the other fell short of its obligations under the parties' broader development agreements. The once-isolated quibbles have grown into competing demands exceeding a million dollars and span from Pennsylvania to Texas.

But while the record is long and the parties' claims now wide-ranging, the core questions remain *mostly* simple: Who was supposed to foot a few certain bills and which party—if either—breached certain parts of the overall bargain?

## I. THE TRIAL

During the four-day bench trial, the Court heard the in-court testimony of:

| | |
|---|---|
| Kathrine Szurek | John Toic |
| Ryan Zelek | Patrick Luther |
| Julian Falgons | David Arnoldi |
| Alex Bord[1] | |

---

[1] Joint Stipulated Facts, ¶¶ 9-10 [hereinafter "Joint Stip. Facts"] (D.I. 96). Katherine Szurek, Ryan Zelek, Julian Falgons, and Alex Bord gave their testimony via live video teleconference. John Toic, Patrick Luther, and David Arnoldi testified in-person. Ricardo Marotta and Scott Walker's trial testimony was received in the form of depositions offered under Del. Super. Ct. Civ. R. 32(a)(3). *Id.*

The parties submitted over 70 exhibits without objection.[2]  Now, the Court will determine the liability of each party under the respective claims and counterclaims, as well as, appropriate damages, if any.[3]

## II. APPLICABLE LEGAL PRINCIPLES AND STANDARDS

The Court has examined all exhibits submitted by the parties and considered the testimony of all witnesses, both direct and cross, live and by deposition.  During trial, the Court applied the Delaware Rules of Evidence to the testimony and the exhibits presented.  Consistent with the Court's knowledge of those rules and the specific rulings the Court articulated during both pre-trial and trial proceedings, the Court has relied only on the evidence allowed under those rules and rulings in reaching its verdict.

As this was a bench trial, the Court is the sole finder of fact.[4]  In turn, the Court has made its own assessment of each witness's credibility and reconciled, to the best of its ability, any inconsistencies in the testimony and documentary evidence.[5]  The Court then reviewed and applied the same instructions that it would

---

[2]  D.I. 90 (Letter from Bradley T. Meyer, Esquire, Enclosing Three Flash Drives of Joint Trial Exhibits Admitted During the Bench Trial Held on April 21, 2025); Joint Stip. Facts, ¶ 3.

[3]  In addition to the trial evidence and arguments made by counsel, the Court also now has the benefit of the parties' post-trial briefing and stipulated facts. D.I. 96-100.

[4]  *Pouls v. Windmill Ests., LLC*, 2010 WL 2348648, at *4 (Del. Super. Ct. June 10, 2010).

[5]  *Pencader Assoc., LLC v. Synergy Direct Mortg. Inc.*, 2010 WL 2681862, at *3 (Del. Super. Ct. June 30, 2010) ("[I]n a bench trial, it is the Court's role to resolve the conflicts in witnesses' testimony and weigh their credibility."); *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 545–46 (Del. Super. Ct.  2005) (setting forth "the customary Delaware standard" a trial judge

give a jury in these circumstances.[6]

The Court has remained mindful throughout its deliberations that the party seeking judgment and relief on its pled claim or counterclaim must prove each element thereof by a preponderance of the evidence.[7]

In reaching its verdict, the Court has considered all applicable law—both Delaware's and other relevant state's—and each party's respective arguments—both oral and written—on the merits of the parties' claims, defenses, and the weight to be accorded to witness testimony and other forms of evidence submitted.[8]

## III. FINDINGS OF FACT

Each of the parties' claims in this action is rooted in the development of a property located in Horsham, Pennsylvania (the "Horsham Property"). Together, the

---

applies when assessing trial testimony and evidence in a bench trial).

[6] *See, e.g.*, Del. Super. Ct. Civ. Pattern Jury Instr. 4.1 (Burden of Proof by a Preponderance of the Evidence); *id.* at 4.2 (Evidence Equally Balanced); *id.* at 23.1 (Evidence—Direct or Circumstantial); *id.* at 23.9 (Credibility of Witnesses—Weighing Conflicting Testimony); *id.* at 23.10 (Expert Testimony).

[7] *Pouls*, 2010 WL 2348648, at *4; *Surf's Up Legacy Partners, LLC v. Virgin Fest, LLC*, 2024 WL 1596021, at *15 (Del. Super. Ct. Apr. 12, 2024), *reargument denied*, 2024 WL 3273427 (Del. Super. Ct. July 2, 2024) ("A party must prove each element by a preponderance of the evidence."). *See Grand Acquisition, LLC v. Passco Indian Springs DST*, 145 A.3d 990, 994 (Del. Ch. 2016), *as revised* (Sept. 7, 2016), *aff'd*, 158 A.3d 449 (Del. 2017) (explicating the preponderance of evidence standard; *see also Reynolds v. Reynolds*, 237 A.2d 708, 711 (Del. 1967) (defining preponderance of the evidence: "The side on which the greater weight of the evidence is found is the side on which the preponderance of the evidence exists."); *Newark Shopping Ctr. Owner, L.L.C. v. Saudades Grp., LLC*, 2025 WL 655063, at *3 (Del. Super. Ct. Feb. 26, 2025) (same).

[8] The Court may highlight certain facts and legal principles uniquely applicable to this case. But the fact that a certain principle is expressly mentioned here does not indicate that the Court did not consider other legal principles applicable to this case and to the parties' claims and defenses during its deliberations.

parties were working in tandem to develop a growing number of retail projects across the United States—a relationship valued in the multi-millions. But that coupling soured over a disagreement as to which party was financially responsible for one $288,866.00 change order (the "Change Order") that arose during the Horsham project.

## A. THE FIRST HARTFORD-WILD FORK RELATIONSHIP

Wild Fork, a specialty supermarket chain, sought to expand into additional American markets, including Pennsylvania and Texas.[9] To facilitate that expansion, Wild Fork entered into a contractual relationship with First Hartford, a real estate development company.[10] The parties memorialized this arrangement in a Memorandum of Understanding (the "MOU") in August of 2020.[11] The MOU established the underlying terms and conditions to facilitate the parties' collaboration on various new Wild Fork store-development projects across the U.S.[12] By year's end, the parties executed a ground lease (the "Lease" or "Ground Lease").[13] The Lease governed First Hartford's role as a landlord, and Wild Fork's as a tenant for

---

[9]    Joint Stip. Facts, ¶ 7.

[10]   *Id.*, ¶ 5; Trial Tr. Day 1, 6 (D.I. 91).

[11]   Joint Stip. Facts, ¶ 23.

[12]   *Id.*, ¶ 23.

[13]   *Id.*, ¶¶ 24-25.

the property located in Horsham, Pennsylvania.[14]

Between June and October of 2021, the parties executed a series of contracts further defining their relationship and obligations.[15] The parties entered into a Master Development Contract (the "MDC").[16] The MDC obligated First Hartford to identify real estate and, upon Wild Fork's approval, develop projects in accordance with the MDC and either the Development Agreement or Lease.[17] Contemporaneous with the MDC, the parties executed a Form of MDC New Property Supplement (the "MDC Supplement").[18] The MDC Supplement specifically governed the Horsham Property and included a site plan and budget.[19]

## B. THE HORSHAM PROJECT

At the heart of this dispute is a lease project, the Horsham Property.[20] As a lease project, its development and the parties' obligations are governed by the MDC, the Lease, and the MDC Supplement.[21] The financial responsibilities of each party are defined by the MDC and the Lease.[22] First Hartford is financially responsible,

---

[14] *Id.*

[15] *See id.*, ¶¶ 26-31.

[16] *Id.*, ¶ 26.

[17] *See id.*, ¶¶ 27-30; TX-5 ("Master Development Contract").

[18] Joint Stip. Facts, ¶ 31.

[19] *Id.*

[20] *See id.*, ¶ 33.

[21] *See id.*, ¶ 34; Master Development Contract.

[22] *See* TX-2 ("Ground Lease"); Master Development Contract.

under Article 7 of the MDC, for "all development and/or construction required of [First Hartford] under the applicable Lease in order to deliver [Wild Fork] a pad-ready site, such as the costs of site development work and utility hook-ups."[23] The Lease further defines First Hartford's responsibilities with respect to delivering to Wild Fork a pad-ready site.[24] Wild Fork is financially responsible, under Article 7 of the MDC, for funding "the remainder of the construction . . . for the full scope of turn-key construction, including interior buildout, furniture, fixtures, and equipment."[25] The Lease also defines Wild Fork's financial responsibilities with respect to a pad-ready site.[26]

Located on the Horsham Property was a then-existing bank building.[27] The parties originally contemplated remodeling the building but ultimately Wild Fork decided to demolish it and construct a whole new storefront.[28] First Hartford engaged Project Builders Incorporated ("PBI"), as the general contractor for the work on the Horsham site.[29] During construction, disputes arose over certain work performed by PBI.

---

[23]   Master Development Contract, at Art. 7.

[24]   *See* Ground Lease, at Ex. B.

[25]   Master Development Contract, at Art. 7.

[26]   *See* Ground Lease, at Ex. B.

[27]   *See* Joint Stip. Facts, ¶ 36.

[28]   *See id.*, ¶ 36; Trial Tr. Day 1, 25-26 (D.I. 91).

[29]   Trial Tr. Day 1, 40-41.

Such work included requests made by Horsham Township and various modifications required in the construction of the new storefront.[30] The Township wanted the parties to include a "Welcome to Horsham" sign on the property and to use certain decorative lighting, similar to the Township's lighting on properties nearby.[31] The new storefront also required certain utility service modifications.[32]

First Hartford conducted off-site water and sewer utility work which needed to be completed to service the new storefront.[33] Additionally, and central to this dispute, the electrical service, which previously had been connected to a pole-mounted transformer, required a redesign.[34] It seems, PECO Energy Company ("PECO") required certain electrical service modifications, including the installation of a new electrical transformer.[35] After learning of Wild Fork's electrical needs, PECO mandated the new transformer which, due to its size and capacity, needed to be placed in a vault.[36] But after initial installation and inspection, PECO required the vault be moved due to its proximity to certain other utility services.[37]

---

[30] *See* Joint Stip. Facts, ¶ 49.

[31] Trial Tr. Day 1, 20.

[32] *Id.*, 31-32.

[33] *Id.*

[34] *Id.*, 32.

[35] *Id.*

[36] *Id.*, 34.

[37] *Id.*, 39-40. Wild Fork and its in-house architect had been consulted on the first vault location. *Id.*

Between May and July 2022, First Hartford submitted a series of communications to Wild Fork identifying what it described as a "change order list."[38] That list included the relocation of the transformer, the decorative lighting and conduit, the "Welcome to Horsham" sign, and the construction of new sidewalks.[39] The total cost of that specific work was $288,866.[40] Confusion arose between the parties as to who was ultimately financially responsible for the Change Order and as a result, PBI went unpaid.[41]

When PBI didn't receive timely payment for the Change Order items, it recorded a mechanic's lien against the Horsham Property in September 2022.[42] On February 28, 2023, counsel for PBI issued a formal demand for payment.[43] By the summer of 2023, PBI had filed suit against both First Hartford and Wild Fork.[44] Wild Fork eventually settled the matter, paying PBI the amount in dispute in exchange for release of the liens and dismissal of the pending litigation.[45]

---

[38] *See* Joint Stip. Facts, ¶¶ 41-48.

[39] *Id.*, ¶ 49.

[40] *Id.*, ¶ 51.

[41] *See id.*, ¶ 54. At one point during this time of uncertainty, Mr. Falgons of Wild Fork marked the Change Order as "approved." *Id.*, ¶ 55.

[42] *Id.*, ¶ 54.

[43] *Id.*, ¶ 59.

[44] *See id.*, ¶¶ 60-63.

[45] *Id.*, ¶ 64.

## C. THE LEASE AMENDMENT AND PROFIT-SHARING PROVISION

The Lease provided that Wild Fork would pay an initial annual rent at the Horsham Property of $130,000.[46]  This amount represented 7.5% of First Hartford's budgeted construction costs.[47]  Recognizing the development had exceeded its initial budget, in March of 2023, First Hartford submitted a request to Wild Fork to amend the Lease (the "Lease Amendment").[48]  The Lease Amendment would increase Wild Fork's annual rent to $143,000.[49]  Wild Fork responded to the Lease Amendment request in May of 2023;  Wild Fork sought to "discuss a comprehensive resolution to all outstanding issues."[50]  Specifically, Wild Fork took issue with certain payments then being withheld by First Hartford to which Wild Fork believed it was entitled under the MDC.[51]

The MDC included a Profit-Sharing Provision that entitled Wild Fork to a portion of the proceeds from any sale of a Lease Project.[52]  At roughly the same time the Horsham project was underway, First Hartford and Wild Fork were engaged in

---

[46]  *Id.*, ¶ 65.

[47]  *Id.*

[48]  *Id.*, ¶ 66.

[49]  *Id.*

[50]  *Id.*, ¶¶ 65-67.

[51]  *Id.*, ¶ 74.

[52]  *See id.*, ¶¶ 27-30; Master Development Contract.

other projects, including multiple properties in Texas.[53] First Hartford sold four such properties but withheld approximately $891,000 in profit-sharing payments owed to Wild Fork reasoning that—due to the Horsham goings-on—Wild Fork had breached their agreements, and therefore, no payments were due under the MDC.[54]

## D. PROCEDURAL BACKGROUND AND THE PARTIES' CONTENTIONS

In June of 2023, First Hartford filed its initial complaint in this Court.[55] Following motion practice that narrowed and framed the issues, the following First Hartford claims proceeded to trial: Breach of Contract (MDC) (Count 1); Breach of Lease Agreement (Count 2); *Quantum Meruit* (Count 3); Unjust Enrichment (Count 4); Violation of CASPA (Count 5); Declaratory Judgment for Rent Adjustment (Count 6).[56] Wild Fork answered with a single breach-of-contract counterclaim.[57] The Court heard trial of these counts[58] and all post-trial briefing is complete.[59]

First Hartford contends that Wild Fork breached the MDC and Lease by failing to pay for the Change Order costs related to work performed by PBI on the

---

[53] Joint Stip. Facts, ¶ 68.

[54] *See id.*, ¶¶ 68-75.

[55] *See* D.I. 1 (First Hartford's first complaint).

[56] *See* Amended Complaint (D.I. 38). The Court earlier dismissed two of First Hartford's counts: Declaratory Judgment on Termination of the MDC (Count 7) and Tortious Interference (Count 8). D.I. 77.

[57] *See generally* Defendant/Counterclaim-Plaintiff Food Ventures North America Inc.'s Answer, Affirmative Defenses, and Counterclaims (D.I. 12).

[58] D.I. 86 (Trial Worksheet).

[59] D.I. 96-100.

Horsham Property. It argues that the Change Order was related to the construction of the building, which Wild Fork is obligated to pay under the Lease. Additionally, First Hartford complains that Wild Fork approved and agreed to pay the Change Order, and its failure to timely do so caused PBI to place a mechanic's lien on the property which adversely affected First Hartford's ability to sell the property.[60]

First Hartford also charges that Wild Fork failed to execute a required Lease Amendment.[61] And, insists First Hartford, Wild Fork's failure to do so caused the property to sell at a significantly lower price than it otherwise would have.[62] Additionally, First Hartford says it's excused from making the profit-sharing payments to Wild Fork for the Texas Properties because Wild Fork materially breached the Master Development Contract.[63] It asks the Court to find Wild Fork in breach of the agreements and for an award of damages it claims to have suffered as a direct and foreseeable result of Wild Fork's conduct.[64]

Wild Fork denies that it breached the agreements in any way. According to Wild Fork, the at-issue work performed by PBI and the related Change Order's costs

---

[60] *See generally* Post-Trial Brief of Plaintiff/Counterclaim Defendant First Hartford Realty Corporation, at 22-28 (D.I. 97) [hereinafter Pl.'s Post-Trial Br.].

[61] *See id.*, at 28-29.

[62] *See id.*, at 28-31.

[63] *See id.*

[64] *See generally* Pl.'s Post-Trial Br.

were "site work" which First Hartford is obligated to pay under the Lease.[65] Wild Fork counters that it wasn't obligated to execute the Lease Amendment.[66] It says First Hartford ignored Wild Fork's request to engage in any meaningful discussion on the issue; choosing instead to file this lawsuit.[67]

In its counterclaim, Wild Fork charges that First Hartford breached its indemnification obligations under both the MDC and the Horsham Lease by refusing to indemnify Wild Fork for the Change Order amounts it paid to PBI.[68] Additionally, Wild Fork alleges that First Hartford is in breach of the MDC for withholding amounts it is owed under the profit-sharing provision for the sale of the Texas properties.[69] Wild Fork asks the Court for an award of $1,180,247.50 which includes amounts it says are owed for the Texas Properties, reimbursement for its payment to clear PBI's mechanic's lien, reasonable fees and costs, as well as pre- and post-judgment interest under Delaware law.[70]

## IV. CHOICE OF LAW

The MDC and the Lease each contain choice-of-law provisions stating that

---

[65] *See generally* Defendant/Counterclaim-Plaintiff's Opening Post-Trial Brief, at 45-46 (D.I. 98) [hereinafter Def.'s Post-Trial Br.].

[66] *See id.*, at 37-39.

[67] *See id.*

[68] *See id.*, at 43-45.

[69] *See id.*, at 28-43.

[70] *Id.*, at 51-54.

the contracts shall be governed by, construed, and interpreted in accordance with the law of the state in which the applicable project is located.[71]  Delaware courts "will generally honor a contractually-designated choice of law provision so long as the jurisdiction selected bears some material relationship to the transaction."[72]  Thus, when a choice-of-law question arises, the Court first determines whether the parties made an effective contractual selection;  if they did, that selection controls. [73]

The Horsham Property is located in Pennsylvania.[74]  For disputes arising from that project—including the Change Order and the Lease Amendment—the contracts

[71]  Master Development Contract, at Art. 13; Ground Lease, at § 30.  Per Art. 13 of the MDC, Delaware is the exclusive venue for any dispute arising from it.

[72]  *J.S. Alberici Const. Co., Inc. v. Mid-West Conveyor Co., Inc.*, 750 A.2d 518, 520 (Del. 2000); *FinClusive Capital, Inc. v. Q2 Software, Inc.*, 2021 WL 5225860, at *6 (Del. Super. Ct. Oct. 28, 2021) ("Delaware courts 'are bound to respect the chosen law of contracting parties, so long as that law has a material relationship to the transaction.'") (quoting *ABRY Partners V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032, 1048 (Del. Ch. 2006)).

[73]  *Certain Underwriters at Lloyds, London v. Chemtura Corp.*, 160 A.3d 457, 464 (Del. 2017) (citations omitted) ("Delaware follows the Second Restatement's 'most significant relationship' analysis when considering choice of law in contract disputes. There are, in essence, three components to this choice-of-law analysis:  i) determining if the parties made an effective choice of law through their contract; ii) if not, determining if there is an actual conflict between the laws of the different states each party urges should apply; and iii) if so, analyzing which state has the most significant relationship."). Delaware Courts will decline to decide whether one or another jurisdiction's laws applies "if there is a 'false conflict.'" *Gea Systems North Am. LLC v. Golden State Foods Corp.*, 2020 WL 3047207, at *4 (Del. Super. Ct. June 8, 2020) (relying on *In re Bay Hills Emerging Partners I, L.P.*, 2018 WL 3217650, at *5 (Del. Ch. July 2, 2018); *BHEP GP I, LLC v. Kentucky Ret. Sys.*, 191 A.3d 292 (Del. 2018); *Standard Gen. L.P. v. Charney*, 2017 WL 6498063, at *9 (Del. Ch. Dec. 19, 2017)).  And a "false conflict" exists if there is no material difference between the laws of competing jurisdictions. *Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1161 (Del. 2010).

[74]  Joint Stip. Facts, ¶¶ 24-25.

designate Pennsylvania law, and the parties don't contest that selection.[75]  Because those choice-of-law provisions are effective and Pennsylvania bears a direct relationship to the Horsham Project, the Court applies Pennsylvania law to those claims and counterclaims.

The dispute concerning the MDC's Profit-Sharing provision, however, arises from projects located in Texas.[76]  Again, under the MDC, the governing law for each dispute is the law of the state in which the applicable project is situated.[77]  The profit-sharing issue concerns profits generated from the Texas properties and withheld in connection with the Texas projects.[78]

First Hartford says that Texas law shouldn't apply.[79]  But the parties expressly agreed to a project-specific choice-of-law structure.  And this Court may apply the governing law of different states to different claims where the contracts call for it; such a bifurcated analysis poses no problem under Delaware law.[80]  Rather, it simply reflects the parties' negotiated expectations in multi-state commercial

---

[75]  *See generally* Joint Stip. Facts; Pl.'s Post-Trial Br.; Def.'s Post-Trial Br.

[76]  *See* Joint Stip. Facts, ¶¶ 68-75.

[77]  Master Development Contract, at Art. 13; Ground Lease, at § 30.

[78]  *See* Joint Stip. Facts, ¶¶ 68-75.

[79]  Pl.'s Post-Trial Br., at 32-35.

[80]  *See generally Chemtura*, 160 A.3d at 465; *see also Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 769-71 (Del. Ch. 2014); *Laugelle v. Bell Helicopter Textron, Inc.*, 2013 WL 5460164, at *3 (Del. Super. Ct. Oct. 1, 2013) (noting in tort actions: "Choice-of-law determinations must be made as to each issue when presented, not to the case as a whole.").

arrangements.[81] Here, Texas plainly has a material relationship to the profit-sharing dispute: the properties are located in Texas, and the profits at issue arose directly from the Texas projects.[82] The existence of separate Pennsylvania-based claims doesn't override the parties' distinct and effective selection of Texas law for disputes tied to the Texas properties.

Because the Court must honor the parties' contractual choice of law, and because Texas has a substantial relationship to the profit-sharing dispute, the Court applies Texas law to that issue.

## V. LEGAL FINDINGS AND CONCLUSIONS

As this was a civil trial, both parties had the burden of proving their respective claims by a preponderance of the evidence.[83]

At the heart of this dispute are competing breach-of-contract claims stemming from a disagreement over which party is financially responsible for the Horsham Project Change Order. The result of this issue is foundational to *nearly all* other claims asserted. As such, the Court will first address the parties' competing breach-of-contract claims thereon. The Court will then turn to First Hartford's CASPA

---

[81] *Chemtura*, 160 A.3d at 464; *Gea Systems*, 2020 WL 3047207, at *4.

[82] *See* Joint Stip. Facts, ¶¶ 68-75.

[83] *See, e.g., Navient Sols., LLC v. BPG Off. P'rs XIII Iron Hill LLC*, 2023 WL 3120644, at *10 (Del. Super. Ct. Apr. 27, 2023) ("Each party bears the burden of proving their respective claims and defenses by a preponderance of the evidence."); *Discover Bank v. Booker*, 259 A.3d 493, (Pa. Super. Ct. 2021) ("A party claiming breach [of contract] must establish its elements by a preponderance of evidence.").

count. Third, the Court addresses Wild Fork's counter that First Hartford is in breach of the MDC Profit-Sharing provision. Fourth, the Court will resolve First Hartford's *quantum meruit* and unjust enrichment claims. And lastly, the Court addresses First Hartford's claim that it is entitled to a rent adjustment.

## A. WILD FORK DID NOT BREACH THE MASTER DEVELOPMENT CONTRACT OR THE GROUND LEASE.

Under Pennsylvania law, three elements must be proven to establish a breach of contract: "(1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) resultant damages."[84] Both parties have satisfied the first and third elements of a breach-of-contract claim.[85] There is no dispute that this project was governed by three primary agreements, the MDC, the MDC supplement, and the Lease.[86] As to damages, First Hartford contends Wild Fork's failure to timely pay for the Change Order resulted in various cascading effects including lost property value and irreparable harm to its business relationships.[87] Wild Fork eventually settled PBI's litigation by paying it for the $288,866.00 Change Order but contends it is owed damages in the amount of the Change Order (exclusive of

---

[84] *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. aw. Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016).

[85] *See Mula Design, LLC D/B/A Mula Group v. Bestchoice Realty, Inc.*, 2025 WL 3090137, at *5 (Pa. Super. Ct. Nov. 4, 2025) (quoting *Pops PCE TT, LP v. R&R Rest. Grp., LLC*, 208 A.3d 79, 87 (Pa. Super. Ct. 2019)).

[86] Joint Stip. Facts, ¶ 34.

[87] Pl.'s Post-Trial Br., at 19-20.

interest) plus its reasonable fees and costs arising out of the PBI litigation.[88]

The true contest, therefore, is over the second element. That is, whether either party has established by a preponderance that the other is in breach of the MDC or Lease.[89] To answer this question, the Court first will look to the relevant MDC and Lease provisions to determine the financial responsibilities of each party.

### 1. The financial responsibilities defined in the MDC and Lease are unambiguous.

It is well-established in Pennsylvania, "that under the law of contracts, in interpreting an agreement, the court must ascertain the intent of the parties."[90] Where the contract is written "the intent of the parties is to be ascertained from the document itself."[91] Pennsylvania courts resist what we'd call here the "twisting" of contractual language; also like Delaware's, those courts refuse to "distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity."[92] Only if the terms are ambiguous, is "parol evidence [ ] admissible to

---

[88] Def.'s Post-Trial Br., at 51-54.

[89] *See generally Mula Design*, 2025 WL 3090137, at *5.

[90] *Lenau v. Co-eXprise, Inc.*, 102 A.3d 423, 429-30 (Pa. Super. Ct. 2014) (quoting *Kripp v. Kripp*, 849 A.2d 1159, 1163 (Pa. 2004)).

[91] *Id.*; *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986) ("The intent of the parties is to be ascertained from the document itself when the terms are clear and unambiguous."); *Pines Plaza Bowling, Inc. v. Rossview, Inc.*, 145 A.2d 672, 676 (Pa. 1958) (discussing the various circumstances that the Commonwealth's courts use may determine intent).

[92] *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999); *Steuart v. McChesney*, 444 A.2d 659, 663 (Pa. 1982) ("[T]he plain meaning of language hinders parties dissatisfied with their agreement from creating a myth as to the true meaning of the agreement through subsequently exposed extrinsic evidence."); *see also Lorillard Tobacco Co. v. Am. Legacy*

explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances."[93]

Under Article 7 of the MDC, First Hartford's responsibilities are defined as follows:

> [First Hartford] will, at [First Hartford's] cost and expense (and without a right of reimbursement from [Wild Fork] unless said expense is an Approved Expenditure) undertake due diligence, design, permitting, entitlement and will pay the costs to purchase the applicable property (without a right of reimbursement from [Wild Fork]). Such costs of [First Hartford], which are not reimbursable by [Wild Fork], shall include all development and/or construction required of [First Hartford] under the applicable Lease in order to deliver to [Wild Fork] a pad-ready site, such as the costs of site development work and utility hook-ups.[94]

Article 7 of the MDC defines Wild Fork's responsibilities as follows:

> [Wild Fork] will fund the remainder of the construction which shall be managed by [First Hartford] (with no management, development or other fee payable to [First Hartford]) for the full scope of turn-key construction, including interior buildout, furniture, fixtures, and equipment.[95]

As it relates to the instant dispute, First Hartford is financially responsible for

---

*Found.*, 903 A.2d 728, 739 (Del. 2006) ("Delaware courts will not destroy or twist [contract] language under the guise of construing it.").

93   *Lenau*, 102 A.3d at 429-30; *Steuart*, 444 A.2d at 663; *In re Herr's Estate*, 161 A.2d 32, 34 (Pa. 1960).

94   Master Development Contract, at Art. 7.

95   *Id.*

all items defined in the Lease to deliver a pad-ready site to Wild Fork; Wild Fork is financially responsible for the remainder of construction, generally limited to projects related or connected to Wild Fork's storefront.[96] The question of breach, therefore, boils down to whether the Change Order is related to those items designated as First Hartford's responsibility under the Lease, which the Court will refer to as "Site Work," or "the remainder of construction" designated as Wild Fork's responsibility, which the Court will refer to as "Building Work."

## 2. The Change Order items are all "Site Work" and First Hartford's financial responsibility.

The Change Order largely arises from the parties' decision to demolish an existing building and reconstruct a new Wild Fork storefront from the ground up.[97] The Change Order included four primary components.[98] Those are: (1) the relocation of an electrical transformer; (2) the decorative lighting required by Horsham Township; (3) the "Welcome to Horsham" sign; and, (4) the construction of new sidewalks.[99] The Court will address each below and relies on Pennsylvania law, as discussed above, to make each determination.

---

[96] Joint Stip. Facts, ¶¶ 37-38.

[97] *See id.*, ¶ 49.

[98] TX-7 (The "Change Order").

[99] Joint Stip. Facts, ¶ 49; Change Order.

### i. The Electrical Transformer

Section 4 of the Lease provides:

> [First Hartford] shall cooperate in causing the Premises to be supplied with adequate water, sewer rents, sewer charges, heat, gas and electricity service. . . . Notwithstanding the foregoing, [First Hartford's] responsibility to supply the aforesaid utilities to the Premises shall be limited to the applicable requirements listed in [Exhibit B].[100]

First Hartford is required to provide adequate electricity service, limited only by Exhibit B.[101] For the site to be "pad-ready," Exhibit B of the Lease requires First Hartford, at its sole expense, to "prepare the site plans" and to provide "Electrical Service to the Building (within 5' of Building or within curb line whichever is closer)."[102] The Lease requires "adequate" electricity service.[103]

At trial, First Hartford's president explained that PECO "dictated that the property could not be serviced simply by the existing pole-mounted transformer."[104] To accommodate Wild Fork's electrical needs, PECO required a new transformer which, due to its size and capacity, needed to be placed in a vault.[105] Stated differently, the new transformer was required to provide adequate electricity service

---

[100] TX-2 (the "Ground Lease").

[101] Ground Lease, at § 4.

[102] *Id.*, at Ex. B ("Work to be Performed by Landlord for 'Pad Ready' Sites").

[103] *Id.*, at § 4, *id.*, at Ex B.

[104] Trial Tr. Day 1, 5, *id.*, at 33-34; *id.* at 107-08 ("As I came to understand it, it was because of the requirements of the large amount of freezer equipment located in the building.").

[105] Trial Tr. Day 1, 34.

for the property's intended use.

Under Section 4 (and Exhibit B) of the Ground Lease, First Hartford was obligated to provide adequate electricity service to the Premises as part of delivering a "pad-ready" site, including preparing the site plans and bringing electrical service to within five feet of the building or the curb line.[106] The Lease's requirement of "adequate" electrical service encompasses whatever electrical infrastructure was reasonably necessary to meet the tenant's anticipated operational needs and to satisfy the utility provider's requirements.[107]

The evidence at trial established that the existing pole-mounted transformer could not supply sufficient power for the Premises' intended use. Testimony from First Hartford itself—together with other evidence—demonstrated that PECO required installation of a new, larger transformer to meet the building's electrical load, and that the transformer's size and capacity necessitated placement within a vault.   The Court finds that installation of this upgraded transformer and vault fell within First Hartford's contractual obligation to provide "adequate . . .electricity service" under the Lease.  Simply put, the new transformer was "Site Work."

### ii. The Decorative Lighting and "Welcome to Horsham" Sign

Next, the Court begins by examining the Lease provisions governing First

---

[106] Ground Lease.

[107] *Id.*, at § 4.

Hartford's responsibility to deliver the site in "pad-ready" condition. Under Lease Exhibit B, as part of that delivery, First Hartford was required to "provide site lighting per the Wild Fork Foods approved lighting plan."[108] To interpret this obligation, the Court "must view the contract as a whole and not in discrete units."[109]

First Hartford seeks to avoid financial responsibility by drawing a distinction between "site lighting" and "township-mandated decorative lighting," thereby arguing that the lighting that the Township sought was Wild Fork's responsibility (e.g., building work rather than site work).[110] Not so. The Lease states that site lighting is First Hartford's responsibility. [111] The Court must "resort to the plain meaning of [that] language" rather than the "myth" of other types of lighting not contemplated by the agreement but admitted through "extrinsic evidence."[112]

But even if the Court agreed that the decorative lighting was somehow different than other lighting on the property contemplated in the plain meaning of

[108] *Id.*, at Ex. B.

[109] *Bethlehem Steel Corp. v. MATX, Inc.*, 703 A.2d 39, 42 (Pa. Super. Ct. 1997) (citing *Halpin v. LaSalle Univ.*, 639 A.2d 37, 39 (Pa. 1994)). *See Southwestern Energy Prod. Co. v. Forest Res., LLC*, 83 A.3d 117, 187 (Pa. Super. Ct. 2013) (citing *Shehadi v. Northeastern Nat'l Bank*, 378 A.2d 304, 306 (Pa. 1977) ("It is fundamental that one part of a contract cannot be so interpreted as to annul another part and that writings which comprise an agreement must be interpreted as a whole."); *Pines Plaza Bowling, Inc. v. Rossview, Inc.*, 145 A.2d 672, 676 (Pa. 1958) ("In construing a contract, the agreement must be interpreted as a whole, and the words given their ordinary meaning.").

[110] Pl.'s Post-Trial Br., at 11.

[111] Ground Lease, at Ex. B.

[112] *Steuart*, 444 A.2d at 663.

the agreement—which the Court does not—the Lease expressly places on First Hartford the obligation to obtain all local approvals, perform off-site improvements required by governmental authorities, and cooperate in causing the Premises to be supplied with utilities.[113] The trial evidence established that the decorative lighting was incorporated into the project because the Township considered it important to securing its full support for the site's change of use.[114] Thusly, not only does the Court find that the Lease required First Hartford to provide "site lighting" that would cover the lights at issue, but these additional provisions collectively demonstrate that First Hartford undertook the obligations necessary to secure governmental approval and prepare the site for Wild Fork's operations.[115]

Had the parties intended to exclude such lighting from the Lease's broad requirement to provide "site lighting," they could have expressly done so. They did not. Under these circumstances, the Court finds that whether termed "site lighting"

---

[113] Ground Lease, at Ex. B.

[114] First Hartford's president testified that the Township "made it pretty clear" that incorporation of the decorative lighting was "above and beyond what the township was looking to have incorporated as part of the project in order to garner its full support to change the use of the site from what was a bank to a new Wild Fork location." Trial Tr. Day 1, 21. The incorporation of the decorative lighting was, in part, a strategic decision to gain the Township's support. *Id.* Wild Fork approved the lighting during the 2020 design process, well before redesigning the storefront or finalizing the project budget. *See* Trial Tr. Day 1, 23-26; Trial Tr. Day 2, 23-24.

[115] *LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 647 (Pa. 2009) ("[I]n determining the intent of the contracting parties, all provisions in the agreement will be construed together and each will be given effect."); *Murphy v. Duquesne Univ. of The Holy Ghost*, 777 A.2d 418, 429 (Pa. 2001) ("The whole instrument must be taken together in arriving at contractual intent.").

or "decorative lighting," the cost is properly characterized as "Site Work" falling within First Hartford's financial responsibility.[116]

The same reasoning applies to the "Welcome to Horsham" sign. Wild Fork's financial obligations relate principally to "improvements," defined in the Lease and MDC as building-related structures and amenities tied to the Wild Fork store and its operation.[117] Under the MDC "Improvements" is defined as

> each [Wild Fork] Store and related improvements, for each Project, as shown on the applicable Site Plan and Plans Specifications, which shall include, without limitation all buildings, structures and other improvements to be located on the Land or within improved building space, in accordance with the applicable MDC New Property Supplement, Lease and/or Development Agreement.[118]

The Township sign, however, is a free-standing brick and concrete structure located near the public sidewalk.[119] It bears no relationship to Wild Fork's store and is not connected to the building in any physical or functional way. The Court can't take a myopic look at just isolated portions of the contract and find for First Hartford; in fact, it is prohibited from doing so.[120] As with the decorative lighting, the sign was

---

[116] The decorative lighting is both site lighting and deemed by both parties as being necessary to gain the Township's support and approval "to construct and operate a Wild Fork Foods store." Ground Lease, at Ex. B.

[117] *Id.*, at § 8.3.

[118] Master Development Contract, at "Definitions".

[119] *See* TX-3.

[120] *Bethlehem Steel Corp.*, 703 A.2d at 42 (instructing that the Court "must view the contract as a whole . . .").

included because both parties believed it necessary to obtain full Township support for redevelopment of the site—support that was First Hartford's to obtain.[121] First Hartford was to obtain "Local approvals", provide "retaining walls" and "landscaping", and other "off-site improvements required by any governmental authority."[122] No doubt, the sign is not *specified* as a responsibility of either party, but when the Lease is read as a cohesive whole, the sign is properly understood as site work for which First Hartford is responsible.[123]

In sum, the Court concludes that the decorative lighting and the "Welcome to Horsham" sign are components of the site work required for First Hartford to deliver the Premises in pad-ready condition. The Lease, its incorporated exhibits, and the evidence presented at trial all demonstrate that these government-driven, publicly oriented improvements fall squarely within First Hartford's obligations, and First Hartford remains financially responsible for them.

### iii. The Sidewalks

The Court also finds that the sidewalk-related work identified in the Change Order constitutes "Site Work" for which First Hartford is financially responsible.

---

[121] Like the decorative lighting, the parties believed the sign to be a necessary improvement "to garner [the Township's] full support to change the use of the site from what was a bank to a new Wild Fork location." Trial Tr. Day 1, 21; Ground Lease, at Ex. B.

[122] Ground Lease, at Ex. B.

[123] *Id.*

Exhibit B of the Lease expressly assigns to First Hartford the obligation to prepare "the subgrade for Building sidewalks" and to provide all "curb cuts, concrete curbs, access driveways, and public sidewalks."[124] These provisions reflect a broad allocation of responsibility for the construction and installation of sidewalks and related public-access features.[125]

Although Lease Section 8.3 makes Wild Fork financially responsible for "improvements," including certain amenities such as sidewalks, that provision applies only after Wild Fork has received all required approvals and has authorized new construction by written notice[126]—further, its obligations to construct sidewalks are only for that of a "typical Wild Fork Food grocery store" and not sidewalks required for government approval.[127] Section 8.3 thus governs Wild Fork's responsibilities during its interior build-out phase—after First Hartford has already delivered a pad-ready site.[128] This is reinforced by Exhibit B, which states that Wild Fork is responsible only for work directly tied to the building foundation, such as

---

[124] *Id.*

[125] *See generally id.*; *Bethlehem Steel Corp.*, 703 A.2d at 42.

[126] Ground Lease., at § 8.3.

[127] *Id.* ("(ii) construct, or caused to be constructed, on the Premises a typical Wild Fork Food grocery store consisting of approximately 3,963 square feet, together with infrastructure, facilities and amenities necessary or desirable in connection therewith (e.g. sidewalks, parking spaces, trash receptacles, landscaping, lighting, etc.) . . .").

[128] *See id.*

excavation, backfill, forming, pouring, and related inspections.[129]   Nothing in Exhibit B shifts responsibility for site-level sidewalks to Wild Fork.

When the relevant provisions are read together, the general structure of the Lease becomes clear: First Hartford must deliver all site-level improvements and public-facing access features necessary to make the Premises pad-ready;[130] Wild Fork assumes responsibility only for building-specific improvements undertaken after approvals are secured.[131]  First Hartford's obligations were to provide "public sidewalks in accordance with the site plans."[132]

Accordingly, the Court concludes that the sidewalk work at issue falls squarely within First Hartford's contractual obligations as "Site Work," and First Hartford is financially responsible for the costs reflected in the Change Order.

### 3.  First Hartford is in breach of the MDC's indemnity provision.

First Hartford has failed to establish that Wild Fork breached the MDC or Lease for Wild Fork's alleged failure to pay the Change Order.  The Change Order projects were all related to "site work" and thus First Hartford's financial responsibility. Similarly, Wild Fork is not in breach of the MDC or the Lease for

---

[129]  Ground Lease, at Ex. B.

[130]  *Id.*

[131]  Ground Lease, at § 8.3.

[132]  Ground Lease, at Ex. B; *see also* Master Development Contract ("The Improvements may consist of but not be limited to the following: a building (or portion thereof), sidewalks, service drives, parking aisles, driveways, parking area, . . .").

failing to remove the PBI lien earlier than it did.

That said, the record reflects two additional points: (1) Wild Fork's representative at one point signaled that Wild Fork would pay for the work at issue,[133] and (2) Wild Fork ultimately did pay PBI for that work to resolve the mechanic's lien and related litigation.[134] Those facts, however, do not alter the Court's conclusion that, under the governing contracts, the Change Order items were "Site Work" and thus First Hartford's financial responsibility in the first instance.

As a result, the Court finds that First Hartford is in breach of the MDC for failing to indemnify Wild Fork in connection with the PBI lien and litigation. Article 9 of the MDC addresses indemnification.[135] The provisions applicable to each party are nearly identical. As relevant here, First Hartford agreed:

> [First Hartford] shall indemnify, defend, protect and hold harmless [Wild Fork] . . . from and against any and all liabilities, damages, obligations, judgments, losses, demands, claims, causes of action, costs and expenses, of any kind or nature (including without limitation, reasonable attorneys' fees and technical consultants' fees and expenses), as they come due and amounts paid in judgment or settlement incurred or sustained by or asserted against [Wild Fork] in any manner directly or indirectly arising out of or resulting from: . . .
>
> > (a)(ii) [First Hartford's] failure to make timely payments to any third-party related to a Project, . . . [136]

---

[133] Joint Stip. Facts, ¶ 55.

[134] *Id.*, ¶ 64.

[135] Master Development Contract, at Art. 9.

[136] *Id.*

Because the Court has already found that the Change Order projects were "Site Work" and First Hartford's financial responsibility, PBI's mechanic's lien and lawsuit plainly "directly or indirectly" arose from First Hartford's failure to make timely payments to PBI, a third-party related to the Project.[137] Under Article 9(a)(ii), First Hartford was obligated to indemnify Wild Fork for the amounts it paid to resolve PBI's claims, as well as Wild Fork's associated fees and costs.[138] Accordingly, Wild Fork is entitled to recover from First Hartford the $288,866.00 Change Order amount, exclusive of interest, plus its reasonable fees and costs arising out of the PBI litigation.

## B. FIRST HARTFORD'S CASPA CLAIM FAILS BECAUSE WILD FORK WAS NOT FINANCIALLY RESPONSIBLE FOR THE CHANGE ORDER.

First Hartford has said that it is owed damages due to a violation of Pennsylvania's Contractor and Subcontractor Payment Act ("CASPA").[139] The CASPA mandates timely payment to contractors and subcontractors involved in construction contracts.[140] But the Court finds that CASPA does not govern here.

---

[137] *See id.*

[138] The Court does not find—given the circumstances it then faced—Wild Fork's decision to ultimately pay PBI and settle the litigation relieves First Hartford of its financial responsibility. Although Mr. Falgons of Wild Fork okayed the payment in order to have the lien removed, the Court does not find that Mr. Falgons was authorized by Wild Fork to alter its financial obligations in that instance. In the Court's view, Wild Fork clearly paid under a reservation of rights to contest that particular change order.

[139] Pl.'s Post-Trial Br., 37-43. *See* 73 PA. STAT. AND CONS. STAT. ANN. § 501, et. seq. (West 2022).

[140] *El-Gharbaoui v. Ajayi*, 260 A.3d 944, 954 (Pa. Super. Ct. 2021).

For the reasons set out above, Wild Fork was not required to pay for any of the expenses of the Change Order.

As Pennsylvania's Superior Court has explained:

> By its terms, CASPA applies to construction contracts. One must first establish a contractual right to payment pursuant to either a written or oral contract, and breach of that contract, to be entitled to CASPA relief. Thus, the construction contract is the starting point of any CASPA analysis. CASPA does not supplant the traditional breach of contract action between contracting parties; it merely makes additional remedies available to contractors and subcontractors when they are not promptly paid by the party with which they contracted.[141]

Given this, the statute is inapplicable. And so, the Court need not even approach the other CASPA-determinative questions of whether Wild Fork was the "owner" of the Horsham Property or First Hartford Wild Fork's "contractor."[142] It is enough to find that the CASPA only applies when a contractor or sub isn't "promptly paid by the party with which [it] contracted."[143] Because Wild Fork is not required to pay for any part of the Change Order, the CASPA does not apply.

---

[141] *Scungio Borst & Associates v. 410 Shurs Lane Developers, LLC*, 106 A.3d 103, 109 (Pa. Super. Ct. 2014).

[142] 73 PA. STAT. AND CONS. STAT. ANN. § 502 (West 2022) ("'Contractor.' A person authorized or engaged by an owner to improve real property." . . . 'Owner.' A person who has an interest in the real property that is improved and who ordered the improvement to be made. The term includes successors in interest of the owner and agents of the owner acting with their authority.")

[143] *Scungio Borst & Associates*, 106 A.3d at 109.

## C. FIRST HARTFORD IS IN BREACH OF THE MASTER DEVELOPMENT CONTRACT'S PROFIT-SHARING PROVISION UNDER TEXAS LAW.

In its counterclaim, Wild Fork contends that First Hartford is in breach of the MDC's Profit-Sharing provision, which obligates First Hartford to pay Wild Fork $891,381.50 in retained profits from the Texas properties.[144] Under Texas law, a plaintiff must establish "the existence of a valid contract, performance or tendered performance by the plaintiff, the defendant breached the contract, and damages resulting from the breach."[145] The parties do not dispute the existence of the MDC or that both sides performed under it. And Wild Fork has also shown that, if First Hartford is in breach, it has suffered damages in the amount of the withheld profit-sharing payments. Accordingly, the only remaining question is whether First Hartford breached the MDC's Profit-Sharing provision.

For the reasons explained above, the Court has already found that Wild Fork didn't breach the MDC or the Lease by refusing to pay the Change Order. The Change Order work was "Site Work" and First Hartford's financial responsibility. Wild Fork's refusal to assume those costs therefore had no effect—legal or practical—on First Hartford's independent obligation to share profits from the Texas

---

[144] *See* Master Development Contract, at Art. 7.

[145] *Dixie Carpet Installations, Inc. v. Residences at Riverdale, LP*, 599 S.W.3d 618, 625 (Tex. Ct. App. 2020).

properties under the MDC.[146]

But even if the Court had found some breach by Wild Fork in connection with the Horsham Project—which, again, it has not—that would not excuse First Hartford's profit-sharing obligations under Texas law. The dispositive question would then be whether any such breach was material.[147] And that question is determinative because, under Texas law, it resolves whether a party is excused from performance—here, payment under the MDC—or whether damages is the appropriate remedy.[148]

As the Texas Supreme Court explained thoroughly in *Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*:

> It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance. By contrast, when a party commits a nonmaterial breach, the other party is not excused from future performance but may sue for the damages caused by the breach. The latter principle is consistent with settled Texas law regarding the elements of a contract claim. The claim requires a finding of breach, not a finding of material breach. . . . Accordingly, a material breach by [a contracting party] would have excused [the other party] from making further contractual payments, while a nonmaterial breach would have simply given rise to a claim for damages.[149]

Texas Courts apply the Restatement (Second) of Contracts for determining

---

[146] *See* Master Development Contract, at Art. 7.

[147] *Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 436 (Tex. 2017).

[148] *Id.*

[149] *Id.* (cleaned up).

- 32 -

whether a breach is material.[150]  Section 241 thereof identifies the following non-exclusive factors:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected; (b) the extent of which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, . . ; (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.[151]

Applying these factors, First Hartford was not deprived of the benefit it reasonably expected from its relationship with Wild Fork—ownership of a developed property and rental income from a functioning Wild Fork store.[152]  Wild Fork substantially performed its obligations; any alleged shortfall related to the Change Order did not undermine the core economic exchange between the parties.[153]  By contrast, excusing First Hartford's performance under the MDC's Profit-Sharing

---

[150] Both Texas and Pennsylvania apply the same factors when determining whether a breach is material. *Compare Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 199 (Tex. 2004), *and Pasha & Sina, Inc. v. Shields Ltd. Partnership*, 2023 WL 2422485, at *6 (Tex. Ct. App. March 9, 2023), *with International Diamond Importers, Ltd. v. Singularity Clark, L.P.*, 40 A.3d 1261, 1271 (Pa. Super. Ct. 2012) *and Widmer Engineering, Inc. v. Dufalla*, 837 A.2d 459, 468 (Pa. Super. Ct. 2003).

[151] RESTATEMENT (SECOND) OF CONTRACTS § 241 (A.L.I. 1981).

[152] *See* RESTATEMENT (SECOND) OF CONTRACTS § 241(a).

[153] *See Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 693 (Tex. 1994); *Widmer Engineering, Inc. v. Dufalla*, 837 A.2d 459, 468-69 (Pa. Super. Ct. 2003).

provision would impose a significant forfeiture on Wild Fork.[154]  It would stand to lose nearly $900,000 in profit-sharing from the Texas properties and potentially further economic benefit from its Horsham operations—all over a dispute that: (1) had little to do with the Texas sales; and (2) the Court has already found involved work that was First Hartford's financial responsibility in the first instance.[155]  What's more, Wild Fork ultimately paid PBI.  To the extent any earlier payment could have been made, the evidence showed that Wild Fork acted in good faith based on a reasonable belief that the Change Order work constituted "Site Work" for which First Hartford was responsible, and that First Hartford certainly had ready means to mitigate any damage from the delay.

Considering the parties' relationship as a whole, the Court cannot conclude that—even if one existed—any alleged breach by Wild Fork related to Horsham was so substantial as to justify First Hartford treating the MDC as effectively terminated or using it as a basis to withhold profit-sharing on the Texas projects.[156]  First Hartford is not excused from its obligations under the Profit-Sharing provision.  It must pay Wild Fork its profit share of $891,381.50.

Texas law also permits recovery of "reasonable attorney's fees from an

---

[154]  *See* RESTATEMENT (SECOND) OF CONTRACTS § 241(c).

[155]  *See id.*

[156]  *See Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 693 (Tex. 1994) ("The less the non-breaching party is deprived of the expected benefit, the less material the breach.").

individual or organization . . . in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract."[157]  Texas Civil Practice and Remedies Code Section 38.001 requires that the claimant prevail on the underlying claim and recover damages in order to recover attorney's fees.[158]  As First Hartford recognizes, "[t]he Texas Statute automatically awards attorneys' fees to [Wild Fork] in this case, assuming they are successful on their Counterclaim for breach of the MDC."[159]  Having found Wild Fork to be the prevailing party on its breach-of-contract counterclaim as to the MDC Profit-Sharing provision, and that it is entitled to damages, the Court further finds that Wild Fork is entitled to recover its reasonable attorney's fees under § 38.001 for this particular issue and claim.[160]

## D. FIRST HARTFORD'S *QUANTUM MERUIT* AND UNJUST ENRICHMENT CLAIMS FAIL BECAUSE THE RELATIONSHIP IS GOVERNED ENTIRELY BY VALID OPERATIVE CONTRACTS.

Pennsylvania law makes clear that a "claim for damages in *quantum meruit* is fundamentally an equitable claim of unjust enrichment."[161]  But the "absence of an

---

[157]  TEX. CIV. PRAC. & REM. CODE ANN. § 38.001 (West 2025).

[158]  *See In re Nalle Plastics Family Ltd. Partnership*, 406 S.W.3d 168, 173 (Tex. 2013) ("To recover attorney's fees under this statute, a party must first prevail on the underlying claim *and* recover damages."). .

[159]  Pl.'s Post-Trial Br., 33-34.

[160]  *James Constr. Grp., LLC v. Westlake Chemical Corp.*, 650 S.W.3d 392, 418 (Tex. 2022); TEX. CIV. PRAC. & REM. CODE ANN. § 38.001 (West 2025).

[161]  *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. L. Firm of Malone Middleman, P.C.*, 179 A.3d 1093, 1102 (Pa. 2018) (quoting *Shafer Elec. & Const. v. Mantia*, 96 A.3d 989, 993 (Pa. 2014)).

enforceable contract at law is the seed from which an unjust-enrichment claim in equity sprouts."[162] Thus, "*quantum meruit* and unjust enrichment, by definition, imply that no valid and enforceable written contract exists between the parties."[163] Where, as here, the parties' rights and obligations are defined by comprehensive, enforceable contracts, the doctrine of unjust enrichment does not apply.[164] Because the MDC, the Lease, and the related supplements fully govern the parties' relationship,[165] First Hartford cannot pursue recovery in quantum meruit or unjust enrichment; these claims fail as a matter of law.

## E. FIRST HARTFORD WAS ENTITLED TO THE RENT ADJUSTMENT.

The evidence also establishes a separate issue concerning the adjustment of base rent under the Lease. Article 7 of the MDC provides that "the final initial rent payable by [Wild Fork] to [First Hartford] under a Lease shall be established by imposing a capitalization rate of 7.5% of [First Hartford's] costs."[166] But in the event the Actual Project Costs exceed the initial estimate of Developer's Costs, Article 7 provides, in relevant part:

---

[162] *Wilson v. Parker*, 227 A.3d 343, 353 (Pa. Super. Ct. 2020).

[163] *Id.* (quoting *Shafer Elec. & Const. v. Mantia*, 67 A.3d 8, 13 (Pa. Super. Ct. 2013), *aff'd on other grounds*, 96 A.3d 989 (Pa. 2014)); *Shafer Elec. & Const.*, 67 A.3d at 13 ("Critically . . . the doctrine of unjust enrichment is inapplicable when the relationship between the parties is founded upon a written agreement or express contract.").

[164] *Shafer Elec. & Const.*, 67 A.3d at 13.

[165] *See* Joint Stip. Facts, ¶ 34.

[166] Master Development Contract, at Art. 7.

in the event the Actual Project Costs exceed the initial estimate of Developer's Costs by an amount greater than one thousand dollars ($1,000.00) and less than a sum equal to one hundred ten percent (110%) [] of the initial estimate of Developer's Costs, then Developer and [Wild Fork] will enter into a mutually agreed upon Lease amendment (each in its reasonable discretion as to the form of the Lease amendment) on or before the ninetieth (90th) day following Developer's delivery and [Wild Fork's] acceptance of each Project in order to increase the final initial annual base rent based on the same formula.[167]

Wild Fork's initial annual rent amount was set at $130,000.00, reflecting 7.5% of the Horsham Project's estimated costs.[168] The initial estimated budget was $1,740,000.00.[169] The final actual cost was $1,922,053.55.[170] For purposes of the rent increase formula, Article 7 of the MDC places a cap on actual costs at 110% of the initial estimated budget.[171] 110% of the original budget is $1,914,000.00. Therefore, the adjusted annual base rent should be 7.5% of $1,914,000.00, or $143,550.00. This provision was triggered in March of 2022 when First Hartford delivered the property to Wild Fork.[172] As such, the Court finds the annual base rent amount should have been $143,550.00 and Wild Fork was obligated to pay this amount beginning in March of 2022 (the time of the store opening) and through to

---

[167] *Id.*

[168] Joint Stip. Facts, ¶ 65.

[169] TX-62.

[170] *Id.*

[171] Master Development Contract, at Art. 7.

[172] *Id.*

the sale of the property in October 2023. [173]

Too, the Court finds that First Hartford has proven by a preponderance of the evidence that it was damaged by a $250,000 loss in value of the property upon its marketing and sale without the required Lease Amendment having been executed.[174]

No doubt, the burden was on First Hartford to demonstrate damages as an element of this specific breach-of-contract claim. "Under Delaware law, plaintiffs must prove their damages with a reasonable degree of precision and cannot recover damages that are 'merely speculative or conjectural.'"[175] But Delaware does not "require certainty in the award of damages where a wrong has been proven and injury established."[176] Indeed, "[t]he quantum of proof required to establish the amount of damage is not as great as that required to establish the fact of damage."[177]

---

[173] *See* Pl.'s Post-Trial Br., at 30 (citing TX-62 and estimating lost rent at "roughly $17,000.00").

[174] *See* TX-60; TX-49; TX-22; TX-23. *See Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2020 WL 948513, at *20 ("[S]o long as a plaintiff provides a reasonable method to calculate damages, the risk that such cannot be determined with mathematical certitude falls on the wrongdoer, not the wronged.").

[175] *Kronenberg v. Katz*, 872 A.2d 568, 609 (Del. Ch. 2004) (quoting *Laskowski v. Wallis*, 205 A.2d 825, 826 (Del. 1964) (quoting *Henne v. Balick*, 146 A.2d 394, 396 (Del. 1958)); *In re Mobilactive Media, LLC*, 2013 WL 297950, at *24 (Del. Ch. Jan. 25, 2013) ("[W]hen acting as the fact finder, th[e] Court may not set damages based on mere 'speculation or conjecture' where a plaintiff fails adequately to prove damages.") (quoting *Medek v. Medek*, 2009 WL 2005365, at *12 n.78 (Del. Ch. July 1, 2009)).

[176] *Del. Express Shuttle, Inc. v. Older,* 2002 WL 31458243, at *15 (Del. Ch. Oct. 23, 2002) (quoting *Red Sail Easter Ltd. Partners, L.P. v. Radio City Music Hall Prods., Inc.,* 1992 WL 251380, at *7 (Del. Ch. Sept. 29, 1992)).

[177] *Total Care Physicians, P.A. v. O'Hara,* 2003 WL 21733023, at *3 (Del. Super. Ct. July 10, 2003).

Responsible estimates of damages that lack mathematical certainty are permissible so long as the fact finder had a basis to make such a responsible estimate.[178]

Instructive here, in the context of contractual damages, our Supreme Court has explained that "when a contract is breached, expectation damages can be established as long as the plaintiff can prove the fact of damages with reasonable certainty. The amount of damages can be an estimate."[179]

Here, the Court has weighed the credible evidence First Hartford adduced regarding the difference in the final sale price and the effect the lack of the Lease Amendment had thereon finding that First Hartford has provided a substantial "basis to make such a responsible estimate" of that damage.[180] And the reasonable estimate of that damage is a $250,000 loss in value.[181] Wild Fork's complaints of too great a level of uncertainty for any damages to be awarded on this issue are unavailing.[182]

---

[178] *Beard Research, Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010), *aff'd sub nom. ASDI, Inc. v. Beard Research, Inc.*, 11 A.3d 749 (Del. 2010).

[179] *Siga Techs., Inc. v. PharmaAthene, Inc.*, 132 A.3d 1108, 1111 (Del. 2015).

[180] *Beard Research*, 8 A.3d at 613.

[181] *See* Trial Tr. Day 2, 187-96 (D.I. 87); TX-60; TX-49; TX-22; TX-23.

[182] *See Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2020 WL 948513, at *20 ("Delaware courts place the burden of uncertainty where it belongs; so long as a plaintiff provides a reasonable method to calculate damages, the risk that such cannot be determined with mathematical certitude falls on the wrongdoer, not the wronged.") (citing *In re Mobilactive Media, LLC*, 2013 WL 297950, at *24).

## VI. VERDICT AND JUDGMENT

Consistent with the foregoing findings and conclusions, the Court enters the following verdict:

- As to First Hartford's Counts I, II, III, IV, and V (breach of the MDC, breach of the Lease, *quantum meruit*, unjust enrichment, and CASPA), the Court finds in favor of Wild Fork and against First Hartford. First Hartford shall recover nothing on those counts.

- As to First Hartford's Count VI—concerning the requested rent adjustment, the Court finds in favor of First Hartford and against Wild Fork. Under Article 7 of the MDC and the Lease, the proper initial annual base rent for the Horsham Property is $143,550.00, calculated as 7.5% of $1,914,000.00 (110% of the original estimated project cost). Wild Fork was obligated to execute a Lease amendment reflecting this rent figure, effective as of March 2022, and to pay to First Hartford the difference between the rent actually paid and the rent that should have been paid at $143,550.00 per year from March 2022 through the property's sale in October 2023.[183] The Court also finds a loss of $250,000 reflecting the price reduction upon the property's sale to have been proven by a preponderance of the evidence. These specific damages carry with them any applicable pre- and post-judgment interest as provided by Delaware law.

- As to Wild Fork's counterclaim alleging breach of First Hartford's indemnification obligations under the MDC and Horsham Lease, the Court finds in favor of Wild Fork and against First Hartford. First Hartford is obligated to reimburse Wild Fork the $288,866.00 paid to PBI in satisfaction of the Change Order work and to indemnify Wild Fork for its reasonable attorney's fees and costs incurred in connection with the PBI mechanic's lien and related litigation, in an amount to be determined upon application if the parties cannot agree.

- As to Wild Fork's counterclaim alleging breach of the MDC's Profit-Sharing provision under Texas law, the Court finds in favor of Wild Fork and against First Hartford. First Hartford is obligated to pay

---

[183] *See* n.173, *supra*.

Wild Fork $891,381.50 in withheld profit-sharing proceeds relating to the Texas properties, together with Wild Fork's reasonable attorney's fees incurred in enforcing the Profit-Sharing provision, pursuant to Texas Civil Practice and Remedies Code § 38.001, in an amount to be determined upon application if the parties cannot agree, as well as applicable pre- and post-judgment interest as provided by law.

The parties are directed to confer and submit a proposed form of final judgment that reflects the specific monetary amounts due under this Decision—including the rent differential, diminution in the sale price of the Horsham Property, indemnity amounts, profit-sharing amounts, attorney's fees, costs, and interest—and that accounts for any appropriate setoff between First Hartford's and Wild Fork's respective monetary obligations. The proposed final judgment shall be prepared and submitted no later than January 9, 2026.

**IT IS SO ORDERED.**

/s/ *Paul R. Wallace*

_____
Paul R. Wallace, Judge

Original to Prothonotary

cc: All counsel via File & Serve